UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| EAT BBQ LLC, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil No. 12-71-GFVT |
| V. ) | |
| ) | |
| THOMAS C. WALTERS, ) | **MEMORANDUM OPINION** |
| ) | **&** |
| Defendant. ) | **ORDER** |
| ) | |
| ) | |

*** *** *** ***

When Dan Liebman and Thomas Walters decided to go in to the restaurant business, Walters brought with him experience, a reputation as an excellent chef and an idea. The idea was to name the new restaurants "STAXX BBQ", a homage to the storied Stax recording studio once located in Memphis, Tennessee.

Unfortunately, like the recording studio, the working relationship between Liebman and Walters no longer exists. STAXX BBQ, however, does. It is located in Frankfort, Kentucky and is owned entirely by Liebman. As for the name, Liebman owns that too, having registered it, without objection, with the United States Patent and Trademark Office (USPTO). Although Walters, understandably, would like to use the name for his own catering business, as explained below, he will be presently enjoined from doing so.[1]

---

[1] On October 18, 2012, Plaintiffs filed a Motion for *Ex Parte* Temporary Restraining Order and Preliminary Injunction for Trademark Infringement [R. 4.] That motion was denied in part because Plaintiffs failed to show that given the circumstances a TRO was necessary. [R. 9.] The Court, however, reserved ruling on whether preliminary injunctive relief was appropriate until after hearing argument from both parties. That hearing was held on November 2, but because of the *ex parte* communication, Walters was also given an opportunity to file a brief addressing the issue, which he submitted on November 6. [R. 14; R. 18.]

1

**I.**

In the summer of 2010, Liebman approached Walters with the idea of starting a restaurant. After a few meetings, the two agreed to move forward, and they opened their first restaurant in Louisville, Kentucky. Each had certain assets they brought to the business endeavor. With the help of a few investors, the financial support came solely from Liebman, while Walters contributed years of restaurant experience, management skills, and the idea for the STAXX name. Before joining Liebman, Walters had used the STAXX moniker in limited circumstances, but had not initiated any process to register it with the USPTO. The Louisville location, STAXX Roadhouse, opened in November 2010, but by August of 2011 it had closed. Prior to its failure, however, Liebman and Walters had already opened their second location, STAXX BBQ in Frankfort, Kentucky in May of 2011. This location is still open for business.

After adopting STAXX as the identifying mark of the restaurants, Liebman decided to apply for protected use of the moniker in two forms, STAXX and STAXX BBQ. Walters found out about the application process, and instead of filing an objection with the USPTO, as is allowed under the application framework, he sent emails to Liebman and Susan Knoll, an investor, encouraging them to add him as an owner of the trademarks. [R. 16, at 20.] Knoll denied his request explaining that he was "not an owner of the marks as defined by the U.S. Trademark Statute." [*Id.* at 21.] Eventually, the marks were approved by and registered with the USPTO, [R. 1-4; R. 1-5.] Plaintiffs currently use these marks in advertisements to promote STAXX BBQ.

Contemporaneous with the trademark issue, several matters arose related to the management and operation of the now-closed Louisville restaurant and STAXX BBQ.

[R. 16, at 21.] When these issues could not be resolved, Liebman and Walters severed their business ties. Walters continues to cater and provide food services, and allegedly, he has been using the marks registered in Liebman's name to promote and advertise his business. [R. 4-7.] Plaintiffs became aware of this alleged infringement and brought suit requesting injunctive relief alleging claims of trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, as well as common-law unfair competition and trademark infringement claims under the laws of Kentucky. [R. 1.] Filed with the Complaint, was a motion for injunctive relief wherein they seek to prohibit Walters from continuing his use of their trademark pending ultimate resolution of this dispute. [R. 4.]

## II.

### A.

Preliminary Injunctions are issued pursuant to Federal Rule of Civil Procedure 65. The standard is well established. District courts must consider (1) whether there is a likelihood of success on the merits of the plaintiff's claim; (2) whether the plaintiff will suffer irreparable harm if the injunction is not granted; (3) whether others would be harmed by granting the injunction; and (4) whether the public good is served by issuing the injunction. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citing *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc)). "These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Id.* (citing *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998).

**B.**

**1.**

Plaintiffs are likely to prevail on their trademark infringement claims pursuant to the Lanham Act, which protects the trademark rights of businesses and individuals. *See* 15 U.S.C. § 1114. To establish likelihood of success on the merits of a trademark infringement claim under the Lanham Act or under Kentucky common law, Plaintiffs must show a likelihood of confusion. *See WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084 at 1086 (6th Cir.1983); *see also Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1121 (6th Circ. 1996); *Maker's Mark Distillery, Inc. v. Diageo North American, Inc.*, 703 F.Supp.2d 671, 688 n.17 (W.D. Ky. 2010); *Winchester Federal Savings Bank v. Winchester Bank, Inc.*, 359 F.Supp.2d 561, 564 (E.D. Ky. 2004). Several factors should be considered in determining whether Walters' use of the trademarks will confuse consumers. Those factors include: (1) the similarity of the trademark; (2) the similarity of the goods or products being offered; (3) the strength of Plaintiffs' trademarks; (4) the marketing channels used; (5) the evidence of actual confusion; (6) the likely degree of care exhibited by the purchaser; (7) the likelihood of expansion of the product lines; and (8) Walters' intent in selecting his mark. *Tumblebus Inc. v. Cranmer*, 399 F.3d 754 (6th Cir. 2005); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

If any circumstance is to create likelihood of confusion then this is it. Determining the similarity of a trademark requires this Court to ask "whether the trade mark will be confusing to the public when singly presented." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988) (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*,

711 F.2d 934, 941 (10th Cir. 1983)). How similar are these marks? They are identical, and because the marks are the same, potential consumers could very well think that Walters and STAXX are the same company, and thus may unintentionally buy Walters' product instead of Plaintiffs'.

Next, the Court considers the strength of the mark. "A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." *Frisch's Restaurant, Inc. v. Elby's Big Boy*, 670 F.3d 642, 647 (6th Cir. 1982). According to Plaintiffs, their service marks are "highly distinctive and unique, and are renowned in the Frankfort and central Kentucky area." [R. 4.] Walters has offered nothing to refute this assertion, and the Court can find nothing in the record to suggest otherwise.

This leads to the next question: are Plaintiffs and Walters using the same channels of commerce? By using advertisements with the STAXX BBQ marks to solicit business through email communication, Walters is indeed using the same marketing channels used by STAXX BBQ. [R. 4-7.] He is intentionally placing the "staxxbbq" email address on his promotional materials impliedly suggesting that he is an agent of STAXX BBQ. [R. 4-7.] Further, he is advertising and competing for the same customers and events as Plaintiffs. [*Id.*; R. 4-2, at 2.] Such occurrences show that Walters has used the same marketing channels to promote his services. *But cf., Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1110 (6th Cir. 1991) ("dissimilarities between the predominant customers of a plaintiff's and defendant's goods or services lessens the possibility of confusion, mistake, or deception.").

5

Walters' use of the same channels of commerce has not resulted in potential confusion, but has instead precipitated actual confusion. During the hearing, Liebman recounted hearing from a lady, an existing customer, who had received an email with promotional materials from Walters. The email included the "STAXX BBQ" trademark, and the "staxxbbq@gmail" email address. The lady was confused, however, about the source of the email because Liebman's name and business contact information were absent from the materials. This one anecdote provides evidence of actual confusion resulting from the use of the same channels of commerce, and "is undoubtedly the best evidence of likelihood of confusion." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 798 (6th Cir. 2004) (quoting *Wynn,* 839 F.2d at 1188).

Given that the same channels of commerce are used, could this affect potential expansion? "Inasmuch as a trademark owner is afforded greater protection against services that directly compete or are in the same channels of trade, a 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1112 (citing Restatement of Torts § 731(b) & comment c (1938)). The evidence proffered to the Court compels a finding that Walters is infringing on the trademark rights of Plaintiffs. There is no reason to forecast the possibility of expansion of the product line or its effects on Plaintiffs' business because Walters is already competing for the same customers, [R. 4-2; R. 4-7] and as already pointed out, using the same channels of commerce resulting in actual confusion.

Finally, what is Walters' intent? Whether he is purposefully attempting to avail himself of the goodwill built by Plaintiffs is unclear, but the case can be argued quite persuasively that by using the STAXX marks to promote his services, he impliedly concedes that he stands a better chance of generating business. Of course, having developed the concept, it is conceivable that Walters feels entitled to use the name along with its marks. Given the realistic possibility that his only intent is to use that which he believes is rightfully his, this factor does not weigh in favor of Plaintiffs. Nevertheless, "'intent is largely irrelevant in determining if consumers likely will be confused as to source.'" *Wynn*, 839 F.2d at 1189 (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986)).

After reviewing all of the applicable factors, a finding of likelihood of confusion is appropriate. Walters claims this does not matter, however, because common law rights flowing from his prior use of the STAXX and STAXX BBQ markings allow him to "operate under the 'STAXX' name throughout central Kentucky including Franklin County, Kentucky." [R. 16.]

Registering a trademark with the USPTO does not "create rights and priority over others who have previously used the mark in commerce," however, registration creates "prima facie evidence of the registrant's ownership and exclusive right to use the mark, 15 U.S.C. §§ 1057(b), 1115(a), and constitutes constructive use of the mark." *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 249 F.3d 564, 572 (6th Cir. 2001). Even with registration, "[t]he territorial rights of a holder of a federally registered trademark are always subject to any superior common law rights acquired by another party through actual use prior to the registrant's constructive use." *Id.*

7

Walters contends that his use of the STAXX trademarks preceded Plaintiffs' use and consequently, based on provisions of the Lanham Act and common law, his title to the marks is superior to theirs. [R. 16, at 16.] It is true, that "[t]he first to use a mark in the sale of goods or services is the 'senior user' of the mark and gains common law rights to the mark in the geographic area in which the mark is used." *Allard Enterprises*, 249 F.3d at 572. However, first use means more than sporadic or casual use; the use should be deliberate and continuous. *See McDonald's Corp. v. Burger King Corp.*, 107 F.Supp.2d 787, 790 (E.D. Mich. 2000). "Common law trademark rights develop when goods bearing the mark are placed in the market and *followed by continuous commercial utilization*." *Id.* (citing *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F.Supp. 96, 113 (S.D.N.Y. 1989) (emphasis added).

At this stage of the litigation, the examples Walters provides of prior use are not sufficient to establish a common law right to the marks. Walters lists the use of a "Staxxroadhouse@gmail.com" email account; the creation of a "Furlongs Catering and Staxx Catering" page, which was started on Facebook on September 27, 2010; the procurement of STAXX sign estimates; and the listing of "Staxx Blackberry Baby Back Ribs" on a menu emailed to Liebman on August 12, 2009 to establish common law rights. [R. 16, at 2-3.] Despite these examples, there is no evidence that potential customers connected the marks with Walters' services, and without establishing that connection, Walters cannot prove his right to the mark. *See Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1055 (6th Cir. 1999).

**2.**

To establish irreparable harm, Plaintiffs must show that unless injunctive relief is granted, they will suffer "'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (citing *Monsanto Co. v. Manning¸* 841 F.3d 1126, 1988 WL 19169, at *6 (6th Cir. Mar. 8, 1998)). Under the trademark infringement framework, once a moving party has demonstrated a likelihood of confusion, irreparable injury is presumed. *Wynn¸* 943 F.2d at 608. Irreparable harm is "inherent in the loss of control over the use of one's registered trademark." *National Bd. Young Men's Christian Associations v. Flint Young Men's Christian Ass'n of Flint, Mich.*, 764 F.2d 199, 202 (6th Cir. 1985) (citing *Burberry's (Wholesale) Ltd. V. After Six Ciro.*, 122 Misc.2d 561, 471 N.Y.S.2d 235 (1984)). Here, Plaintiffs have lost control of their registered trademark because Walters has decided to use the mark in his advertising and promotion of his catering business. Given this infringement of Plaintiffs' trademark, irreparable harm is presumed. *See Circuit City*, 165 F.3d at 1055.

Although Plaintiffs are allowed to recover monetary damages under the Lanham Act's statutory framework, 15 U.S.C. § 1117(a), monetary damages will only remedy a portion of the harm done. They will not compensate Plaintiffs for the considerable loss of goodwill potentially suffered. "Where a defendant infringes upon a plaintiff's trademark, causing irreparable harm, an injunction is appropriate to protect the plaintiff's reputation and goodwill that it has established in its marks." *ProNational Ins. Co. v. Bagetta*, 347 F.Supp.2d 469, 473 (E.D. Mich. 2004) (citing *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201 (6th Cir. 2004)). Because of the potential harm to Plaintiffs' goodwill

and the presumption that irreparable harm follows a finding of likelihood of success on the merits, this factor weighs in favor of granting the preliminary injunction.

### 3.

The lack of potential harm to others also weighs in favor of granting Plaintiffs' request for injunctive relief. The focus, here, is whether the defendant will suffer harm if the court grants injunctive relief, and whether the harm plaintiff will suffer is more or less than the harm to the defendant. *See Southern Ohio Coal Co. v. United Mine Workers of America*, 551 F.2d 695 (6th Cir. 1977). Before the hearing, the Court was concerned about a potential ownership interest in the trademark for Walters. He has also argued that as first user of the STAXX markings, he is entitled to protection. The evidence, however, does not support Walters' view. The trademarks are registered in Liebman's name, and registration establishes prima facie evidence of ownership and solidifies the owner's exclusive right to use it. *Allard Enterprises,* 249 F.3d at 572; *see also* 15 U.S.C. §§ 1057(b), 1115(a). Without establishing any right to the trademark grounded in common or statutory law, the Court is unaware of any harm that might befall Walters. Moreover, granting the injunction does not foreclose Walters' ability to run his business. He would simply give up the right to use a federally protected trademark to do it. Plaintiffs, on the other hand, face significant harm to their reputation and goodwill if Walters is allowed to continue using their mark.

### 4.

Finally, consideration of the public interest also weighs in favor of granting injunctive relief. "'Trademark infringement, by its very nature, adversely affects the public interest in the 'free flow' of truthful commercial information.'" *Big Boy*

*Restaurants v. Cadillac Coffee Co.*, 238 F.Supp.2d 866, 873 (E.D. Mich. 2002) (quoting *Gougeon Bros., Inc. v. Hendricks*, 708 F.Supp. 811, 818 (E.D. Mich. 1988)). Allowing Walters to continue his use of the trademark runs afoul of the statutory protections guaranteed to Plaintiffs, and increases the chance that potential customers might inadvertently purchase Walters' services when they intend to procure Plaintiffs' services. *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (affirming the district court's decision to issue an injunction to "prevent consumers from being misled."). Hence, the need for injunctive relief based on the public interest.

## C.

In the event that a district court grants a request for injunctive relief, Rule 65 requires the movant to provide a bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While this rule appears to be mandatory, district courts have "discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Plaintiffs raise this issue briefly in their motion, but Walters did not address it. Given the Court's current position, the parties will be given ten days to file briefs addressing the necessity and amount, if appropriate, of a bond.

## III.

For the reasons articulated, the Court finds that issuing a preliminary injunction is appropriate. Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

  (1) The Motion for *Ex Parte* Temporary Restraining Order and Preliminary Injunction for Trademark Infringement [R. 4] is **GRANTED in part**;

  (2) PENDING final resolution of this matter, Walters is prohibited from using the STAXX and STAXX BBQ trademarks in any capacity to advertise or promote his business ventures; and

  (3) The parties shall have ten days to file briefs to address the necessity and amount, if appropriate, of a bond.

  This 16th day of November, 2012.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge